IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALVIN D. PRITCHETT, JR., | No. C 06-2208 CW (pr) |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES DAVIS, Chairman, Board of Parole Hearings, | |
| Respondent. | |

Petitioner Calvin D. Pritchett, Jr., proceeding pro se, has filed a petition for a writ of habeas corpus pursuant to title 28 U.S.C. § 2254, challenging as a violation of his constitutional rights the denial of parole by the California Board of Parole Hearings (Board).[1]

On December 4, 2006, Respondent James Davis filed an answer. On February 2, 2007 Petitioner filed a traverse. Having considered all of the papers filed by the parties, the Court DENIES the petition.

---

[1] The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole Hearings. Cal. Penal Code § 5075(a).

1                          BACKGROUND

2  At Petitioner's first parole suitability hearing on August 6, 2003,
3  which is at issue here, the Board considered the following
4  information, derived from the San Diego County Probation Officer's
5  Report, about the murder of Jeff Burnett:

6           On August 19 of 1991, at approximately 8:21
            a.m., police received a call regarding the
7           discovery of a body in the Pine Valley area of
            San Diego County. . . . The body was in a state
8           of extensive skeletonization and advanced
            decomposition.  Three ligatures and an electric
9           cord secured a blanket around the remains.
            . . .  A post-mortem examination revealed a
10          slug in the left chest area.  There appeared to
            be a gunshot wound to the face.  The shot to
11          the chest was believed to be the cause of
            death. . . . The victim's girlfriend . . .
12          testified that she and the victim were in the
            process of buying a limousine from the prisoner
13          at the time of the victim's death. . . the
            victim made arrangements to meet with the
14          prisoner to make another payment. . . . After
            the victim had not returned home . . . . [t]he
15          prisoner confirmed that Burnett had attended
            the meeting and denied knowing where the victim
16          went later. . . John Baldon testified [at the
            preliminary hearing] that the prisoner informed
17          him he had killed the victim in self-defense.
            Later during the preliminary hearing, Mr.
18          Baldon testified the prisoner had told him the
            murder was not only pre-planned, but was an
19          assassination.  Baldon helped remove the body
            from the prisoner's home, but was in fear of
20          the prisoner who carried the murder weapon on
            him while they disposed of the body.  He
21          further related the prisoner was proud of the
            murder and told Baldon . . . the offense was
22          committed to protect the prisoner's family from
            the victim. The prisoner wanted to take
23          pictures of the deceased to give to his uncle
            for his photo album and also talked of cutting
24          off the victim's hands to destroy them. Baldon
            asserted that all aspects of the disposal of
25          the body and weapon were done under the
            direction of the prisoner.  When Mr. Baldon
26          arrived at the prisoner's house, the body was
            hanging in the closet with its head covered in
27          a plastic bag.  There was blood on the floor

28                                    2

United States District Court
For the Northern District of California

1         under the body.  The prisoner told Baldon he
        meant to kill Armando Leon first, not the
2         victim.  He also wanted to kill a vice
        detective named Lehr.  The prisoner wore gloves
3         for disposing of the victim's car and wiped the
        vehicle down for fingerprints.  Armando Leon
4         testified that he had moved onto the property
        of the prisoner's father . . . .  Mr. Leon
5         informed the court that the prisoner approached
        him prior to the murder and asked Leon's help
6         in killing the victim. . . . The prisoner
        informed the police the offense had been
7         committed in self defense.

8 (Resp't Ex. E, Initial Parole Suitability Hearing Transcript at 9-

9 14.)

10      On August 28, 1992, Petitioner entered a plea of guilty to

11 second degree murder with the use of a firearm, pursuant to People

12 v. West.[2]  (Pet'r Ex. 4, Transcript of Proceedings at 6.)  Under

13 the plea agreement, all additional allegations were dismissed by

14 the district attorney.  (Id. at 2.)   The San Diego superior court

15 judge explained that "there are otherwise no agreements concerning

16 sentencing meaning that the maximum sentence that could be imposed

17 as a matter of law is twenty years to life in state prison."  (Id.)

18 Petitioner agreed with the judge's characterization of his West

19 plea as:

20     although you may dispute your factual culpability to some
    greater or lesser degree in this case, nonetheless, as a
21     matter of law, you wish to plead guilty to this charge of
    second degree murder and admit the allegation in order to
22     avoid the potential of a greater sentence or harsher
    consequences befalling you were this case to proceed to
23     trial.

24 (Id. at 6.)  Both the prosecution and defense stipulated that the

25 ───────────────

26     [2]In California, a plea under People v. West, 3 Cal. 3d 595
(1970), permits a defendant to deny committing a crime while
admitting that there is sufficient evidence for a conviction.  Roe
27 v. Flores-Ortega, 528 U.S. 470, 473 (2000).

28                                   3

preliminary hearing transcript could be used to provide a factual basis for the plea. (Resp't Ex. B, Probation Officer's Report at 1.) Petitioner's attorney noted that he had advised Petitioner of the possibility that he could be eligible for parole after serving half of his sentence. (Pet'r Ex. 4 at 5.) The judge informed Petitioner that he should not expect a reduced sentence; although he might become legally eligible for parole after serving two-thirds of his minimum sentence, a life sentence "means the very real potential . . . [that Petitioner] could be in prison for the rest of [his] natural life." (Id. at 5.) Petitioner stated that he understood the consequences of his plea and admission. (Id.)

On November 6, 1992, the superior court sentenced Petitioner to fifteen years to life in prison with the possibility of parole, plus an additional five year firearm enhancement. (Resp't Ex. A, Abstract of Judgment at 2.) Petitioner is incarcerated at the Correctional Training Facility at Soledad. (Resp't Ex. E at 1.) He started serving his sentence on November 19, 1992, and his minimum eligible parole date was July 30, 2004. (Id.) Petitioner was represented by counsel at his initial parole suitability hearing on August 6, 2003. (Id. at 2.)

Since his incarceration, Petitioner has maintained a positive work history. He has received three laudatory chronos for work performance. (Id. at 39.) He has worked as a program clerk, a chapel clerk with above average work report ratings, a law library clerk with above average exceptional work reports, and a housing unit porter with satisfactory reports. (Id. at 35.) On April 1, 1998, Plaintiff's custody classification was reduced to Medium A.

4

1   (Id.)  On June 6, 2000, Plaintiff was assigned to be a teacher's
2   aide in landscaping, and he received exceptional reports.  (Id.)
3   Plaintiff took a vocational class in landscaping and horticulture,
4   where he received A and B grades, and on August 3, 2000, he
5   received a certificate of completion.  (Id. at 35-36.)  At the time
6   of the initial parole suitability hearing Petitioner was working in
7   the vocational upholstery shop.  (Id. at 44.)

8       While incarcerated, Petitioner also engaged in many self-help
9   programs.  (Id. at 36-39.)  In 1998, he participated in a seven
10  week bible study series.  (Id. at 36.)  In 1999, Petitioner
11  completed a Prison Fellowship Ministries (PFM) training program,
12  bible study courses and a Life Skills Program.  (Id.)  In 2000, he
13  participated in a PFM program.  (Id.)  In 2001, Petitioner took
14  part in a children's Christmas festival and two PFM training
15  programs.  (Id.)  In 2002, he completed a fourteen week IMPACT
16  program and "Perspective from the Eyes of the Victims" and a
17  twenty-two week introduction to Spanish course, with a grade of
18  eighty-five percent.  He also volunteered as a Spanish instructor
19  in a literacy program, participated in a bible trivia series and an
20  Easter trivia program and took part in several PFM programs.  (Id.
21  at 36-37.)  In 2003, Petitioner was a facilitator for the Usher
22  Program, received certificates for his participation in PFM and
23  bible studies and completed Project Change.  (Id. at 39.)

24      The Board also looked at Petitioner's pre-incarceration
25  history, and noted that he had no prior criminal or juvenile arrest
26  record.  (Id. at 31.)  Prior to his conviction, Petitioner had
27  graduated from high school and completed approximately ninety-one

5

units at San Diego State University. (Id. at 31-32.) At the time of the crime, Petitioner worked at a carpet cleaning business and his father was awaiting trial on pandering charges. (Id. at 32-34.)

The Board considered a 2003 report by Petitioner's correctional counselor. Upon assessing Petitioner's commitment offense, prior record and prison adjustment, the counselor found that Petitioner would pose a moderate to minimal degree of threat to society if released from prison. (Id. at 45.) The counselor noted that Petitioner had "programmed exceptionally well" in prison; he remained disciplinary-free, participated in numerous self-help programs, received several exceptional vocational reports, had solid parole plans, possessed good communication skills, and got along well with staff members. (Id. at 45-46.)

Petitioner's 2003 mental health evaluation indicated that he "made gains psychologically since being incarcerated" and that "his violence potential is estimated to be no higher than the average citizen in the community." (Id. at 49.) The evaluation took into account Petitioner's lack of criminal history and the gains he made since being incarcerated, particularly through his utilization of self-help. (Id.) The evaluation also included an observation that Petitioner had a history of making poor choices when involved in conflictual social situations, and would "most likely benefit from additional opportunities to improve [him]self," particularly those that "focus on interpersonal relationship skills." (Id. at 49-50.)

The Board also considered the twenty-four support letters that were submitted on Petitioner's behalf, noting that they were sent

6

1  from family, friends, church acquaintances and others, from both
2  Georgia and California.  (Id. at 52-58.)   Several letters offered
3  Petitioner a place to stay if he was paroled, including one from a
4  friend, one from an aunt, and one from his mother, Wanda Hughes.
5  Ms. Hughes said that she had a place for Petitioner to live in
6  Georgia, would support him and provide him with transportation and
7  aid.  (Id. at 57.)   Petitioner also received several letters
8  containing offers of employment and employment assistance,
9  including one from his second cousin, Lucy Lanier, offering a job
10 in landscaping and one from Richard Carpenter, the owner of the
11 Adopt-A-Highway Service in San Diego.  (Id. at 55, 58.)   Among the
12 letters offering financial support, Petitioner received one from
13 John Palhegyi, the father of a friend, who wrote that he would
14 provide Petitioner with clothing and a gift of one-hundred dollars
15 a month for six months.  (Id. at 56.)   If paroled, Petitioner
16 stated, he would like to live with his mother and help out on his
17 family's farm in south Georgia.  (Id. at 50.)   Petitioner said that
18 he had a friend at the Department of Labor in Georgia, who would
19 give him leads on landscaping jobs.  (Id. at 51.)
20      Finally, the Board considered the opposition to Petitioner's
21 parole.  A letter from the San Diego County Sheriff urged the Board
22 to deny parole, "due to the brutal and callous manner in which this
23 crime was carried out and the total disregard for human life."
24 (Id. at 59.)   A San Diego County deputy district attorney wrote a
25 letter stating, "given the level of sophistication . . . and the
26 cruel and callous way it was perpetrated," Petitioner should not be
27 paroled because he posed "a risk of harm to society."  (Id. at 60.)
28

7

Deputy District Attorney Genaro Ramirez, who was present at the hearing, reported the District Attorney's opposition to parole, pointing out the egregious nature of Petitioner's crime and "his lack of self-help." (Id. at 77.) Deputy District Attorney Ramirez asserted that, although Petitioner killed Jeff Burnett, Petitioner felt that he was the victim. (Id. at 72.) Consequently, Ramirez argued, Petitioner "is not accepting responsibility" and has not "come to grips with what he did." (Id. at 74-76.)

After deliberation, the Board concluded that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released. (Id. at 83.) The Board set Petitioner's next parole consideration hearing for 2007 and found that it was not reasonable to expect that parole would be granted at a hearing during the intervening four years. (Id. at 87-88.) The Board stated that its paramount reason for denying parole was the gravity and timing of Petitioner's offense, and the evidence that the offense was carried out in an especially vicious and brutal manner." (Id. at 83.) The Board found that Petitioner was dispassionate and calculated in committing the crime, and demonstrated an "exceptionally insensitive regard for human suffering" by luring the victim to his apartment, shooting him twice, and disposing of the body the way he did. (Id.) The Board also noted that it was troubled by conflicts and irregularities in Petitioner's testimony, which indicated that he had not fully accepted culpability for his crime. (Id. at 90.)

Although the Board commended Petitioner for actively participating in self-help, staying out of trouble and achieving

8

marketable vocational skills, it found that Petitioner's gains were recent and that he must continue to demonstrate "the ability to maintain those gains for an extended period of time." (Id. at 86-87.) In the interim, the Board directed Petitioner to remain disciplinary-free and to participate in self-help programming that would assist him to "understand the causative factors" as well as his culpability in committing the crime. (Id. at 89.)

On June 9, 2005, Petitioner filed a petition in Superior Court for a writ of habeas corpus challenging the Board's decision. (Resp't Ex. F, Aug. 3, 2005 San Diego County Superior Court Order at 1.) The court denied the petition, finding that the Board did not abuse its discretion by denying Petitioner's parole. (Id.)

The California Court of Appeal also denied Petitioner's petition for habeas corpus. (Resp't Ex. G, Nov. 21, 2005 California Appellate Court Order at 3.) The court explained that the facts of Petitioner's crime, including luring the victim to his apartment, shooting him in the face and chest, hanging the body in a closet, and shrouding and abandoning the victim's body, justified the Board's finding that the "murder was carried out in an especially vicious, brutal and calculated manner." (Id. at 2-3.) Further, the court rejected Petitioner's argument that the Board relied on dismissed special circumstances to find him unsuitable for parole. (Id. at 3.) The court also found that the Board appropriately considered "the base and other commitment offenses, including behavior before, during and after the crime," pursuant to 15 Cal. Code Regs. § 2402(b). (Id.) Therefore, the court found that "some evidence" supported the Board's denial of parole. (Id.)

On August 3, 2005, the California Supreme Court summarily denied Petitioner's request for review. Subsequently, Petitioner brought a federal habeas petition in this Court.

## LEGAL STANDARD

Because this case involves a federal habeas corpus challenge to a state parole eligibility decision, the applicable standard is contained in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002).

Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

Respondents concede that Petitioner has exhausted his state remedies by filing the petition for a writ of habeas corpus in the California Supreme Court. Where, as here, the highest state court to reach the merits issued a summary opinion which does not explain the rationale of its decision, federal court review under § 2254(d) is of the last state court opinion to reach the merits. Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000). In this

10

case, the last state court opinion to address the merits of Petitioner's claim is that of the California Court of Appeal.

## DISCUSSION

Petitioner argues that (1) he was denied due process because the Board's decision was not supported by evidence that he is presently dangerous; (2) the State violated his plea agreement; and (3) the Board violated Apprendi by relying on unproven facts related to a special circumstances allegation that was dismissed.

### I. Due Process Claim

Petitioner asserts that his due process rights were violated by the Board's decision to deny parole because its decision was arbitrary and not supported by "some evidence." Specifically, Petitioner contends that the Board placed undue weight on the unchanging factor of the gravity of the commitment offense as a predictor of present dangerousness, without adequately considering the other suitability factors outlined in 15 Cal. Code Regs. § 2402. Petitioner's claim fails.

Under California Penal Code § 3041, state prisoners whose sentences allow for the possibility of parole have an interest, protected by the Due Process Clause, in a parole release date. Irons v. Carey, 505 F.3d 846, 850 (9th Cir. 2007). Consequently, a parole board's decision must be supported by "some evidence" to satisfy the requirements of due process. Superintendent v. Hill, 472 U.S. 445, 455 (1985). When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant state.

11

Id. California law provides that, when a prisoner serving an indeterminate life sentence becomes eligible for parole, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration." Cal. Penal Code § 3041(b). To make the determination of whether a prisoner is suitable for parole, the Board applies suitability factors[3] outlined in the California Code of Regulations. Hayward v. Marshall, 512 F.3d 536, 543 (9th Cir. 2008).

Additionally, the evidence underlying the Board's decision must have some indicia of reliability. McQuillion, 306 F.3d at 904. Although a parole denial based solely on the gravity of the commitment offense can initially satisfy due process requirements, over time, "a continued reliance on an unchanging factor such as the circumstances of the commitment offense, pre-conviction

---

[3] The factors tending to show unsuitability for parole are (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner; (2) the prisoner has a previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner has committed sadistic sex offenses; (5) the prisoner has a history of mental or psychological problems; and (6) the prisoner has engaged in serious misconduct while in prison. 15 Cal. Code Regs. § 2402(c). The factors tending to show suitability for parole are (1) the prisoner has no juvenile record; (2) the prisoner has a stable social history; (3) the prisoner has shown signs of remorse; (4) the prisoner was motivated to commit the crime out of stress; (5) the prisoner suffered from Battered Woman Syndrome; (6) the prisoner lacks a significant criminal history; (7) the prisoner's age reduces the probability of recidivism; (8) the prisoner has realistic plans for release; and (9) the prisoner's behavior in prison indicates an ability to function within the law upon release. Id. § 2402(d).

criminal history, or other past conduct, might in some cases result in a due process violation." Hayward, 512 F.3d at 545 (citing Biggs v. Terhune, 334 F.3d 910, 916 (9th Cir. 2003)). In Hayward, the Ninth Circuit overturned the Governor's reversal of the Board's grant of parole, holding that no evidence supported the Governor's conclusion that the release of the petitioner, who had served twenty-seven years in prison for second-degree murder, would threaten the public safety. Id. at 547. In Irons, the Ninth Circuit explained that Biggs represents the law of the circuit that continued reliance on a prisoner's commitment offense or conduct prior to imprisonment could result in a due process violation over time. Irons, 505 F.3d at 853. Nevertheless, the court held that, given the egregiousness of the commitment offense, due process was not violated when the Board deemed a prisoner unsuitable for parole prior to expiration of his minimum term. Id. at 846. Likewise, Sass v. California Bd. of Prison Terms, 461 F.3d 1123 (9th Cir. 2006), pertained to a prisoner who had not yet served his minimum sentence at the time of the challenged parole. In Sass, the court determined that "evidence of Petitioner's prior offenses," along with "the gravity of his convicted offenses" constituted "some evidence" to support the Board's decision. Id. at 1129.

In denying Petitioner's request for parole, the Board opined that the commitment offense demonstrated that Petitioner displayed an "exceptionally insensitive disregard for human suffering." (Resp't Ex. E at 88.) The Board noted that Petitioner murdered Burnett in "an especially vicious and brutal manner," and pointed to the Statement of Facts, indicating that Petitioner lured the

13

victim to his apartment, shot him multiple times, shrouded the body and kept it in a closet, and attempted to enlist the aid of others in disposing of the body. (Id. at 83-84.) The Ninth Circuit's evolving guidance suggests that because this was Petitioner's first parole hearing and because he had not yet served the minimum number of years to which he had been sentenced, the Board did not violate Petitioner's due process rights by relying heavily on the static factor of the commitment offense.

During Petitioner's parole suitability hearing, the Board also cited a need for more therapy and self-help programming before release. (Id. at 84.) The Board was pleased that Petitioner had stayed out of trouble, noting that, prior to the commitment offense, he had no history of criminality or misconduct and while in prison, he had programmed well. (Id. at 84.) It also commended Petitioner for completing various vocational programs and participating in personal self-help programs, including IMPACT and Project Change. (Id. at 87.) However, the Board determined, Petitioner had not yet demonstrated full responsibility for his crime and the positive aspects of his profile were outweighed by the factors of unsuitability. (Id.) It found that Petitioner:

> still needs some therapy in order to face, discuss, understand and cope with stress in a nondestructive manner so that [he] can better understand the causative factors as well as his culpability in this particular crime, the crime of taking the life of Mr. Burnett.

(Id. at 86.) Finally, the Board stressed the importance of continuing to participate in self-help programming, such as Breaking Barriers, Anger Management, and Alternatives to Violence. (Id. at 89.)

14

The Board concluded that Petitioner's participation in beneficial self-help programs was relatively recent, and that Petitioner must demonstrate "the ability to maintain those gains for an extended period of time." (Id. at 87.)[4] The Board explained that Petitioner's 2003 mental health evaluation, which noted his history of making poor choices when involved in conflictual social situations, also counseled against parole. (Resp't Ex. E at 85.) Thus, the Board relied on more than the single "unchanging factor" of the timing and gravity of Petitioner's commitment offense in denying him parole.

Although the Board's decision at issue here does not constitute a due process violation, as the Ninth Circuit has stated, over time, continuous denial of parole based on the commitment offense could result in denial of due process. This was Petitioner's initial parole suitability hearing. Should Petitioner continue to follow the Board's advice by attending self-help programs and maintaining a positive disciplinary record, continued parole denials based on Petitioner's commitment offense alone could eventually give rise to a due process violation.

The California courts' conclusion that the record contained "some evidence" to support the Board's finding that Petitioner was

---

[4] Petitioner asserts that the Board failed to recognize that Project Change was an anger management course. Although the Board acknowledged that Petitioner had completed Project Change, it found that he had failed to complete anger management programming. (Id. at 87-89.) Regardless of the content of Project Change, the Board determined that Petitioner needed more time to focus on a broader spectrum of programming, beyond anger management, that would help him understand both the causative factors and his culpability in the crime. (Id. at 89.)

15

unsuitable for parole was reasonable, both in light of the facts and controlling federal law. Accordingly, Petitioner's due process claim is DENIED.

II. Plea Agreement Claim

Petitioner further alleges that the Board violated his plea agreement. This claim is without merit.

Plea agreements are contractual in nature and subject to contract law standards of interpretation. In re Ellis, 356 F.3d 1198, 1207 (9th Cir. 2004) (citing United States v. Hyde, 520 U.S. 670, 677-78 (1997)). Thus, a petitioner is entitled to habeas relief if he or she enters into a plea agreement with a state prosecutor, and the prosecutor breaches the agreement. Gunn v. Ignacio, 263 F.3d 965, 969-70 (9th Cir. 2001). However, after sentencing, a defendant who pleads guilty may not collaterally challenge a guilty plea that was voluntary and intelligently entered into with the advice of competent counsel. United States v. Broce, 488 U.S. 563, 572 (1989). Nor may a defendant collaterally attack this plea's validity merely because he or she made what turned out, in retrospect, to be a poor deal. Bradshaw v. Stumpf, 545 U.S. 175, 186 (2005).

Although Petitioner characterizes his plea agreement as a contract between Petitioner and the Board, it was actually an agreement between Petitioner and the San Diego County District Attorney. The plea agreement specified that Petitioner would plead guilty to second degree murder with the use of a firearm and in return the District Attorney would dismiss all additional allegations. (Pet'r Ex. 4 at 2.) When Petitioner entered his

16

guilty plea on August 28, 1992, in open court, the judge clarified that "there are otherwise no agreements concerning sentencing" and Petitioner could be sentenced to twenty years to life in state prison. (Id.)  Petitioner does not provide evidence that the plea agreement is anything other than the agreement described by the judge, nor does he argue that the District Attorney violated the agreement by pursuing any of the other allegations.  Therefore Petitioner's argument that his plea agreement was violated fails.

III. Apprendi Claim

Finally, Petitioner argues that the Board used inadmissible evidence in making the parole determination,[5] because it looked at allegations to which Petitioner had not plead guilty.  This claim is without merit.

The United States Supreme Court has ruled that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000).  For example, an allegation that a criminal defendant used a firearm in the commission of the underlying offense may not be adjudicated by a judge alone where doing so could alter the maximum penalty for the crime.  Dillard v. Roe, 244 F.3d 758, 773 (9th Cir. 2001).

---

[5] Petitioner argues that the Board relied on previously stricken allegations in order to increase punishment. Alternatively, Petitioner argues that the Board used evidence outside the scope of the plea "contract."  As discussed in the previous section, Respondent did not violate Petitioner's plea agreement.  Therefore, other arguments related to this claim are unavailing.

17

However, <u>Apprendi</u> does not apply here because the statutory maximum for second degree murder in California is an indeterminate life sentence. Cal. Penal Code § 190(a). Further, when entering his guilty plea, Petitioner stipulated that the preliminary hearing transcript could be used to provide a factual basis for the plea. (Resp't Ex. B at 1.) The facts that the Board considered during Petitioner's parole hearing derived from this transcript. (Resp't Ex. E at 9.) Accordingly, because the decision to deny parole was based on the facts to which Petitioner plead guilty, and the decision neither increased the maximum penalty for second degree murder nor Petitioner's sentence, Petitioner's <u>Apprendi</u> claim is DENIED.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

The Clerk of the Court shall enter judgment, terminate all pending motions, and close the file.

IT IS SO ORDERED.

Dated: 3/19/08

CLAUDIA WILKEN
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

CALVIN D. PRITCHETT JR.,

        Plaintiff,

v.

BOARD OF PAROLE HEARINGS et al,

        Defendant.

Case Number: CV06-02208 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 19, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Amber Nicole Wipfler
Office of the Attorney General
Correctional Law Section
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102-7004

Calvin D Pritchett Jr. H56017
PO Box 689 B-237-U
Soledad, CA 93960-0689

Dated: March 19, 2008

        Richard W. Wieking, Clerk
        By: Sheilah Cahill, Deputy Clerk